**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

WAYNE REED HAFF, :
Plaintiff, :
v. : Case No. 5:26-cv-63-MTT-ALS
LAVON HARRELL, *et al.*, :
Defendants. :

---

WAYNE REED HAFF, :
Plaintiff, :
v. : Case No. 5:26-cv-79-CAR-AGH
Sheriff CRAIG PEAVY, *et al.,* :
Defendants. :

---

**ORDER**

Plaintiff Wayne Reed Haff, an inmate incarcerated at Irwin County Detention Center in Ocilla, Georgia, filed a *pro se* Complaint seeking relief pursuant to 42 U.S.C. § 1983, which was docketed under case number 5:26-cv-63 ("*Haff I*"). Subsequently, Plaintiff filed another *pro se* Complaint, also seeking relief pursuant to 42 U.S.C. § 1983, and that case was docketed under case number 5:26-cv-79 ("*Haff II*"). Plaintiff then filed a motion to "enjoin" in both cases (Doc. 13 in 5:26-cv-63; Doc. 13 in 5:26-cv-79), which the Court construes as a motion to consolidate both cases, and a renewed motion for leave to proceed *in forma pauperis* ("IFP"). (Doc. 12 in 5:26-cv-63; Doc. 14 in 5:26-cv-79). For the reasons stated below, the Court grants Plaintiff's motions to consolidate and grants

Plaintiff's renewed motions for leave to proceed IFP. Plaintiff's Complaints are ripe for preliminary review. Upon review, Plaintiff is **ORDERED** to file a recast Complaint if he wishes to proceed with this action.

## ORDER TO CONSOLIDATE

As noted above, Plaintiff moves to consolidate *Haff I* (Doc. 13) and *Haff II* (Doc. 13). The Federal Rules of Civil Procedure authorize this Court to consolidate actions that "involve a common question of law or fact." *See* Fed. R. Civ. P. 42(a). While the defendants in *Haff I* and *Haff II* are different, and there are some different factual allegations and claims asserted in the two actions, the two cases involve many common questions of law and fact. Thus, consolidation of Plaintiff's cases will conserve judicial resources and permit a more efficient resolution of Plaintiff's claims. It is therefore **ORDERED** that Plaintiff's motions to consolidate are **GRANTED**; *Haff II* is **CONSOLIDATED** into *Haff I* and case number 5:26-cv-79 is **ADMINISTRATIVELY CLOSED**.[1]

## MOTION TO PROCEED IFP in *HAFF I*

Plaintiff filed a renewed motion to proceed IFP (Doc. 12). The Court granted Plaintiff's initial motion to proceed IFP (Doc. 2) and ordered that he pay an initial partial filing fee of $91.70. (Doc. 9 at 3-4). However, the Court noted that if Plaintiff's financial circumstances changed, he could file a renewed motion to proceed IFP. *Id*. at 5. Plaintiff subsequently filed a response to the Court's order explaining his inability to pay the initial partial filing fee. (Doc. 11 at 2). Plaintiff's submissions indicate that he is currently unable

[1]In addition to the motion to consolidate, Plaintiff filed two motions for an injunction in *Haff II*. (Docs. 6, 9). The motions for injunctive relief in *Haff II* are identical to those filed in *Haff I* (Docs. 7, 10). Therefore, upon consolidation, the Clerk is **DIRECTED** to terminate any pending motions in *Haff II*, including Plaintiff's renewed motions to proceed IFP (Docs. 11, 14). Unless otherwise specified, any further docket numbers referenced in this order refer to filings in *Haff I*.

to pay the initial partial filing fee. Accordingly, it is hereby **ORDERED** that his renewed motion to proceed IFP (Doc. 12) is **GRANTED**; that his Complaint be filed, and that he be allowed to proceed without paying an initial partial filing fee.

## I. Directions to Plaintiff's Custodian

Plaintiff is required to make monthly payments of 20% of the deposits made to his prisoner account during the preceding month toward the full filing fee. The clerk of court is **DIRECTED** to send a copy of this Order to the business manager of the facility in which Plaintiff is incarcerated. It is **ORDERED** that the warden of the institution in which Plaintiff is incarcerated, or the sheriff of any county in which he is held in custody, and any successor custodians, shall each month cause to be remitted to the clerk of this Court twenty percent (20%) of the preceding month's income credited to Plaintiff's account at said institution until the $350.00 filing fee has been paid in full. 28 U.S.C. § 1915(b)(2). In accordance with provisions of the Prison Litigation Reform Act ("PLRA"), Plaintiff's custodian is authorized to forward payments from the prisoner's account to the clerk of court each month until the filing fee is paid in full, provided the amount in the account exceeds $10.00. It is **ORDERED** that collection of monthly payments from Plaintiff's trust fund account continue until the entire $350.00 has been collected, notwithstanding the dismissal of Plaintiff's lawsuit or the granting of judgment against him prior to the collection of the full filing fee.

## II. Plaintiff's Obligations Upon Release

Plaintiff should keep in mind that his release from incarceration/detention does not release him from his obligation to pay the installments incurred while he was in custody. Plaintiff remains obligated to pay those installments justified by the income in his prisoner trust account while he was detained. If Plaintiff fails to remit such payments,

the Court authorizes collection from Plaintiff of any balance due on these payments by any means permitted by law. Plaintiff's Complaint may be dismissed if he is able to make payments but fails to do so or if he otherwise fails to comply with the provisions of the PLRA.

**PRELIMINARY REVIEW OF PLAINTIFF'S COMPLAINTS**

## I. Standard of Review

The PLRA directs courts to conduct a preliminary screening of every complaint filed by a prisoner who seeks redress from a government entity, official, or employee. 28 U.S.C. § 1915A(a). Courts must also screen complaints filed by a plaintiff proceeding IFP. 28 U.S.C. § 1915(e). Both statutes apply in this case, and the standard of review is the same. "*Pro se* filings are generally held to a less stringent standard than those drafted by attorneys and are liberally construed." *Carmichael v. United States*, 966 F.3d 1250, 1258 (11th Cir. 2020) (citation omitted). Still, the Court must dismiss a prisoner complaint if it "(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also* 28 U.S.C. § 1915(e).

A claim is frivolous if it "lacks an arguable basis either in law or in fact." *Miller v. Donald*, 541 F.3d 1091, 1100 (11th Cir. 2008) (citations omitted). On preliminary review, the Court may dismiss claims that are based on "indisputably meritless legal" theories and "claims whose factual contentions are clearly baseless." *Id.* (citations omitted). A claim can be dismissed as malicious if it is knowingly duplicative or otherwise amounts to an abuse of the judicial process. *Daker v. Ward*, 999 F.3d 1300, 1308, 1310 (11th Cir. 2021) (affirming dismissal of duplicative complaint "in light of [prisoner's] history as a prolific serial filer").

A complaint fails to state a claim if it does not include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Factual allegations [in a complaint] must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555 (citations omitted). In other words, the complaint must allege enough facts "to raise a reasonable expectation that discovery will reveal evidence" supporting a claim. *Id.* at 556. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

To state a claim for relief under § 1983, a plaintiff must allege that (1) an act or omission deprived him of a right, privilege, or immunity secured by the Constitution or a statute of the United States; and (2) the act or omission was committed by a person acting under color of state law. *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995). If a litigant cannot satisfy these requirements or fails to provide factual allegations in support of his claim or claims, the complaint is subject to dismissal. *See, e.g.*, *Bingham v. Thomas*, 654 F.3d 1171, 1176-77 (11th Cir. 2011) (affirming dismissal of certain claims at preliminary screening because prisoner failed to allege sufficient facts to show a violation of his rights), *abrogated on other grounds by Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024) (en banc).

## II. Factual Allegations

On March 2, 2019, Plaintiff was traveling from Wisconsin to Florida when he pulled off the road in Georgia to take a nap. *Haff II* (Doc. 1 at 6).[2] A deputy with the Dooly

---

[2]The Court refers to the Complaints (Doc. 1), in respective case numbers 5:26-cv-63 (*Haff I)* and 5:26-cv-79 (*Haff II*).

County Sheriff's Office ("DCSO") woke Plaintiff and instructed him to open his vehicle window. *Id.* at 7. When Plaintiff did so, the deputy noticed a marijuana pipe on the passenger seat, which led to a search of Plaintiff's vehicle that revealed three (3) grams of marijuana and bottles with a trace amount of methamphetamine. *Id.* at 7-8. Plaintiff states that the methamphetamine resulted from his failed attempt to "make a bottle of 'shake and bake,' a pop bottle recipe off YouTube to make a small amount of methamphetamine." *Id.* at 6. Plaintiff was arrested and charged with possession of less than an ounce of marijuana, possession of drug related objects, possession of heroin, and possession of methamphetamine. *Id.* at 7. Plaintiff was indicted for manufacturing methamphetamine, possession of less than an ounce of marijuana, possession of drug related objects, and possession of methamphetamine with intent to deliver.[3] *Id.* at 8. Plaintiff contends that the last charge resulted from "someone" in DCSO testifying falsely to the grand jury that there was enough methamphetamine to support a charge of possession with intent to deliver. *Id.*

Plaintiff was placed in the Dooly County jail, and on March 6, 2019, Defendant Randy Lamberth ("Lamberth"), a DCSO detective, told Plaintiff that he needed to register Plaintiff as a sex offender because Plaintiff "was a registered sex offender from Wisconsin from a crime from 1989, conviction 1990." *Id.* Plaintiff asserts that his registration as a sex offender was improper because he was not a resident of Georgia, had not been in Georgia for more than seventy-two hours prior to his arrest, and was not required to register while he was in jail. *Id.* at 8-9. Plaintiff contends that he was not required to register until he was released from jail, and then only if he intended to stay in Georgia for

[3] Although not specifically stated by Plaintiff, the Court is able to discern that the charges arose in the Superior Court of Dooly County, Georgia.

more than seventy-two hours. *Id.* at 9.

In August 2019, Plaintiff began negotiations with the State to resolve his pending criminal charges. *Haff I* (Doc. 1 at 5). Plaintiff had several phone interviews with Ronald Beyers ("Beyers"), an administrator for The Christian Family Center ("CFC"). *Id.* Beyers told Plaintiff that if the prosecutor required that Plaintiff have a "reserve[d] bed" at the center, the director of CFC would testify on Plaintiff's behalf "to reserve a bed." *Id.* Contrarily, if the prosecution did not require a reserved bed, Plaintiff "was approved as a walk up and a bed would be available" for him. *Id.* Plaintiff informed Beyers of the fact that he "had a sexual assault on his record from 1989," and Beyers responded by stating that Plaintiff would be restricted to the housing units if he had "proximity restrictions and sex offender rules." *Id.* If Plaintiff did not have any restrictions, he could participate in the program fully. *Id.* Plaintiff alleges that he fit into the second category on both issues "as the prosecution did not require [him] to have a reserved bed." *Haff I* at 5.

On August 26, 2019, Plaintiff entered a negotiated guilty plea to manufacturing methamphetamine, possession of three grams of marijuana, and possession of drug related objects, under which he would be sentenced to fifteen years, to serve five years in prison and the balance on probation. *Id.* at 6. Under the terms of the plea agreement, Plaintiff's confinement would be suspended upon successful completion of the CFC program. *Id.* After accepting Plaintiff's guilty plea, the judge ordered that Plaintiff "be released the following morning, August 27, 2019, to be transported by family or friends to the CFC." *Id.*

Defendant Harrell, an employee of the Georgia Department of Community Supervision ("DCS"), was assigned to Plaintiff's case after his sentencing. *Id.* at 2, 6. Harrell "refused" to authorize Plaintiff's release "on August 27, 2019, or any time after

that," telling the jail administrator that Plaintiff did not have a reserved bed at CFC. *Id.* at 6. Plaintiff states that Beyers later told Plaintiff that he had waited for him to arrive at CFC on August 27, 2019, with an available bed and wondered why he never showed up. *Id.* at 7.

The state court held a hearing approximately one month following Plaintiff's sentencing, and the judge queried why Plaintiff was still in jail instead of at CFC. *Id.* at 6-7. Plaintiff's defense attorney stated, "Judge[,] we are trying to get him a bed." *Id.* at 7. Plaintiff claims the statement made by his defense attorney was "false," because "Mr. Beyers had a bed for [him]." *Id.* Plaintiff "tried to speak," but the judge told him to let his attorney speak for him. *Id.* The judge then said they would review the matter in another month. *Id.* If Plaintiff was still in jail at that time, the court would allow Plaintiff to either withdraw his guilty plea or the court would "unsuspend the sentence." *Id.*

Before one month expired, Beyers "changed the policy at CFC to not allow any more sex offenders because the ones he was getting could not participate in the program because of sex offender rules." *Id.* at 7. Plaintiff's attorney filed a motion to withdraw the guilty plea, which the court granted. *Id.* Plaintiff was re-sentenced to 15 years, with five years to be served in prison and the balance on probation.[4] *Id.* at 8.

After serving twenty-seven months in prison, "the parole board issued [Plaintiff] 7 PIC points, which was a flag to the counselors" that Plaintiff was eligible for release. *Id.* Plaintiff's prison counselor, Craig Wallace ("Wallace"), wanted to send Plaintiff to a transition center following his release. Wallace contacted Harrell "for a level letter" regarding Plaintiff's "1990 sex offense." *Id.* When Harrell did not send the requested level

[4]Plaintiff does not explain the events between him withdrawing his guilty plea and then being sentenced to the same sentence—absent the suspension—that he originally received.

letter within thirty days, Wallace contacted Harrell again. *Id.* Harrell responded by stating, "Well, Mr. Haff's not my only client, he'll just have to wait." *Id.* Plaintiff then sent a letter to Defendant Norton, Harrell's supervisor, and complained that Harrell had previously "denied to release [him] for [his] plea bargain" and that she was now "blocking" him from going to a transition center. *Id.* at 9. Norton did not respond. *Id.* Another prison counselor, Burnwell, contacted Harrell and reported back to Plaintiff that "Harrell had no intention of providing [him] with a cover letter [because] she did not want [Plaintiff] released from prison." *Id.* Harrell never provided a letter. *Id.*

To get around not having a level letter, Burnwell instructed Plaintiff to provide addresses for private residences where Plaintiff could reside following his release. *Id.* Burnwell explained that she would send each address to Harrell, who was supposed to send it to the supervision office where the residence was located for investigation. *Id.* The request would then be sent back as denied or approved. *Id.* at 9. Plaintiff provided over ten addresses. *Id.* However, all the residences were denied without investigation. *Id.* Burnwell then submitted Plaintiff's "name for problem housing off the THOR's list."[5] *Id.* at 10.

Eleven months before Plaintiff's discharge date, Harrell contacted the Sexual Offender Risk Review Board ("SORRB") and recommended that Plaintiff be labeled as a Sexually Dangerous Predator ("SDP").[6] *Id.* Plaintiff alleges that Harrell "provided

[5] THOR refers to the "Transitional Housing Opportunities for Reentry" program that provides community-based housing for persons released from prison or on probation. DCS Reentry Housing, Transitional Housing Opportunities for Reentry (THOR), https://sites.google.com/dcs.ga.gov/dcsreentryhousing/transitional-housing-opportunities-for-reentry-thor (last visited Aug. 31, 2026).

[6] SORRB is attached to the Georgia Department of Behavioral Health and Developmental Disabilities and classifies convicted sexual offenders based on their risk of re-offending. Sexual Offender Risk Review Board, About Us, https://sorrb.georgia.gov/organization/sexual-offender-risk-review-board (last visited Aug. 4,

erroneous information to the board," causing him to be labeled as an SDP and moved to a Ware State Prison, which is "a level 5 prison." *Id.* Plaintiff was also removed from consideration for parole. *Id.* at 10. When Plaintiff was eventually released from prison, the Georgia Department of Corrections ("GDC") issued a "level letter", which stated Plaintiff was a "low risk with no sex offender rules and no proximity restrictions." *Id.* Further, Plaintiff alleges that the "sex offender officer" at DCSO also evaluated Plaintiff as low risk. *Id.* Finally, Plaintiff states that under O.C.G.A. § 17-10-6.2, he is listed as low risk and "should not be on the Georgia Registry at all." *Id.*

Plaintiff was released from prison on March 2, 2024. *Id.* at 11. Harrell arranged for Plaintiff to be transported to a motel in Vienna, Georgia and "dropped off in the parking lot with a broken foot and a phone number to call her." *Id.* When Plaintiff called her, he asked if she had booked him a room, and Harrell responded, "Oh, no[,] we don't help people with that." *Id.* at 11. Plaintiff told her he had no money or clothes and did not know anybody in Georgia, to which Harrell responded that Plaintiff would have to "figure it out" and that it was not her problem. *Id.* She also told him that he would have a new probation officer. *Id.* Plaintiff's new probation officer, Defendant Dustin Broadway, submitted three requests for emergency housing for Plaintiff, and Harrell denied all three, "leaving [Plaintiff] homeless with no resources and a broken foot on the streets of Vienna, Georgia." *Id.* In May 2024, Plaintiff asked if his probation could be transferred to his home in Pennsylvania due to his homelessness, and Broadway claimed that he put the request in. *Id.* at 16. Plaintiff states that the request would have gone to Harrell. *Id.*

---

2026). Level 1 sex offenders are deemed to have an average or lower risk of re-offending, Level 2 sex offenders are deemed to be an above average risk, and SDP offenders are deemed to have a well above-average risk. Sexual Offender Risk Review Board, Risk Classification, https://sorrb.georgia.gov/risk-classification (last visited Aug. 4, 2026).

Plaintiff further asserts that a probation officer in Pennsylvania told him that no transfer request was ever received. *Id.* at 16.

On June 5, 2024, Plaintiff was approved to transfer his probation supervision to Pine Mountain, Georgia and live in a residence there. *Id.* at 12. He "unregistered" as a sex offender in Dooly County and subsequently registered at the Troup County, Georgia, sheriff's department. *Haff II* (Doc. 1 at 11). However, on June 12, 2024, Plaintiff saw his roommate smoking methamphetamine with a pistol lying on the coffee table. *Haff I* (Doc. 1, at 12). Plaintiff contacted "probation officer" Clapham in LaGrange, Georgia, and told him that the residence "was not a good situation" for Plaintiff. *Id.* Clapham responded by telling Plaintiff that he could either "go register homeless, find a new place to live[,] or go back to Dooly County." *Id.* Later that morning, Clapham texted Plaintiff to tell him that he had made an appointment for the next morning, or Plaintiff could return to Dooly County. *Id.* Plaintiff texted Clapham the next morning to tell him that he was going back to Dooly County, to which Clapham texted "okay." *Id.*

After speaking with Clapham, Plaintiff returned to the residence in Pine Mountain, packed his belongings into his truck, and on the morning of June 14, 2024, "headed back to Vienna[,] Georgia."[7] *Id.* at 13. Plaintiff "spent several hours" in Oglethorpe, Georgia, before going to a truck stop in Vienna. *Id.* In the early morning hours of June 15, 2024, he left the truck stop and drove to a friend's house. *Id.* However, on the way, he had an accident, resulting in his truck rolling into a water-filled ditch. *Id.* Officers responded to the scene, and Plaintiff was cited for improper backing and no registration for his vehicle.

[7]Plaintiff alleges that he "unregistered" in Troup County on June 17, 2024, and told "them" that he was not sure where he was going. *Haff II* (Doc. 1 at 11). He was told to register within seventy-two hours of arriving "wherever" he went. *Id.*

*Id.* Plaintiff then went to Cordele, Georgia to try to find a temporary job. *Id.* at 11. However, Broadway informed him that there was a probation warrant for his arrest for "moving before [Plaintiff] had permission." *Haff I* (Doc. 1 at 13). Plaintiff turned himself in at the Dooly County jail on June 18, 2024. *Haff II* (Doc. 1 at 11). Plaintiff states he did not register again in Dooly County, signed no registration card, and that the Georgia Sex Offender Registry still had him registered in a Georgia prison. *Id.*

Plaintiff's probation revocation hearing was held on September 16, 2024. *Id.* at 12. Broadway and Clapham testified. *Haff I* (Doc. 1 at 14-15). Plaintiff states that Broadway lied during the hearing and that Lamberth sat through the testimony without alerting the court to the misinformation. *Id.* at 14; *Haff II* (Doc. 1 at 12-13). Plaintiff also claims that Broadway tampered with a witness by contacting Clapham during the hearing by telephone. *Haff I* (Doc. 1 at 14). When Clapham arrived, he testified that he believed Plaintiff to be "a dangerous criminal and [he] should never be released from prison." *Id.* at 14-15. Plaintiff states that "clearly this was staged" since he had never met Clapham in person and they only exchanged brief phone calls and text messages. *Id.* at 15. Broadway and the prosecutor asked that Plaintiff be sentenced to two years in prison on the revocation, but he was instead sentenced to 170-180 days in a probation detention center. *Id.* at 15-16; *Haff II* (Doc. 1 at 14).

During the revocation hearing, Plaintiff told Defendant Sheriff Peavy and Lamberth that he would be returning to his home in Pennsylvania upon his release. *Haff II* (Doc. 1 at 14). Plaintiff was released from the detention center on March 3, 2025, crossed the Georgia line at 11:00 p.m., and arrived at his home in Pennsylvania on March 4, 2025. *Id.* However, he contends that Lamberth appeared before a grand jury and "provided false testimony" that Plaintiff was required to re-register in Dooly County

following his release, resulting in an indictment.[8] *Id.* at 14-15. Plaintiff contends that he was not required to register in Dooly County because he was not going to be in Georgia for more than seventy-two hours. *Id.*

Plaintiff was returned to the Dooly County jail in November 2025, whereupon he informed "the nurse" and jail staff that he suffers from "Dementia-Alzheimer['s]," but they "failed to provide any type of treatment." *Id.* at 15. Further, Plaintiff suffered a "gallbladder attack," and an emergency room doctor told him that it needed to be removed. *Id.* at 16. Plaintiff claims he overheard Defendant Nurse White contacting hospitals asking them to "take" him. *Haff II* (Doc. 1 at 16). Nurse White told Plaintiff that Lamberth was attempting to have him placed in federal custody so that they would have to "take care of it."[9] *Id.* Plaintiff was then seen by "an unknown" doctor who performed no examination but "instructed Nurse White to document high Bilirubin." *Id.* In addition, Plaintiff has periodontal disease and his teeth continued to "break off." *Id.* He alleges that "they" only gave him some Listerine which did nothing to relieve the pain. *Id.* Finally, Plaintiff required the use of a walker or wheelchair because he is a fall risk, with the last fall occurring in May 2025 in Pennsylvania. *Id.* at 15. Plaintiff contends that he was kept in a segregation cell because of his mobility issues and that Lamberth decided his "medical issues contrary to Hippa Laws" and "us[ed] it as a terroristic tactic" to make Plaintiff "resolve the criminal charge." *Haff II* (Doc. 1 at 17).

---

[8] While Plaintiff does not specify the court in which the indictment was returned, the Court notes that a criminal indictment was returned in this Court on September 11, 2025, charging Plaintiff with failure to register as a sex offender. *United States v. Haff*, No. 5:25-cr-42-MTT-CHW (M.D. Ga. Sept. 11, 2025), Doc. 1. On November 18, 2025, a superseding indictment was returned, again charging Plaintiff with failure to register as a sex offender. *United States v. Haff*, No. 5:25-cr-42-MTT-CHW (M.D. Ga. Nov. 18, 2025), Doc. 31. The Court has authority to take judicial notice of its own records. *United States v. Rey*, 811 F.2d 1453, 1457 n.5 (11th Cir. 1987) (citation omitted).

[9] Plaintiff was placed in federal custody on or about March 6, 2026, and is currently detained at the Irwin County Detention Center. (Doc. 6 at 2).

## III. Plaintiff's Claims

Plaintiff's factual allegations can be broken down into six distinct time periods. The first period involves events leading up to his 2019 indictment in Dooly County Superior Court. The second period concerns his efforts to be admitted to CFC as part of a plea agreement in August 2019. The third period concerns events resulting in the denial of his release on parole. The fourth period involves the chain of events following his release from prison on March 2, 2024, to the revocation of his probation. The fifth period encompasses his release from prison in Georgia in March 2025 to his indictment and return to the Dooly County jail. Finally, the sixth period involves the medical care he received following his return in November 2025 to the Dooly County jail.

### A. 2019 Dooly County Indictment

Plaintiff alleges that "someone" from the DCSO lied to the grand jury by stating that the methamphetamine found in his vehicle on March 2, 2019, was sufficient to show intent to distribute. *Haff II* (Doc. 1 at 8). It is not clear if Plaintiff wishes to assert a claim related to the grand jury testimony, but to the extent he does, this allegation fails to state a claim. Regardless of which officer from the DCSO testified at the grand jury, he or she is entitled to absolute immunity for their testimony, even if false. *See Rehberg v. Paulk*, 566 U.S. 356, 369 (2012) ("[A] grand jury witness has absolute immunity from any § 1983 claim based on the witness' testimony."); *Jones v. Cannon*, 174 F.3d 1271, 1286 (11th Cir. 1999) (holding that a police detective "is absolutely immune from a § 1983 civil action for his testimony, even if false, before the grand jury").[10]

[10] The Court need not address the various other possible impediments to such a claim, including the statute of limitations, the *Heck* doctrine, or the simple fact that Plaintiff does not sufficiently identify a defendant who can be served with process.

B. <u>Denial of Release to CFC</u>

Plaintiff alleges that Harrell lied by informing the Dooly County jail administrator that he could not be released on August 27, 2019, because he did not have a reserved bed at CFC. *Haff I* (Doc. 1 at 6-8). He further alleges that Harrell "went back and doctored the paperwork to state that I could not go to the CFC [due] to being a convicted sex offender," which Plaintiff states was also a lie. *Id*. at 8. Finally, he alleges that Lamberth's actions in wrongly registering him as a sex offender prevented him from being released to CFC. *Haff II* (Doc. 1 at 10).

It is not clear what federal right, privilege, or immunity Plaintiff claims Harrell and Lamberth violated by preventing his release to CFC. It may be that Plaintiff is asserting a procedural due process claim. "To establish a procedural due process claim under § 1983, a plaintiff must show: (1) a deprivation of a constitutionally protected liberty or property interest, (2) state action, and (3) constitutionally inadequate process." *Bryant v. Ruvin*, 477 F. App'x 605, 607 (11th Cir. 2012) (citing *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003)). The Dooly County Superior Court sentence arguably created a liberty interest entitling Plaintiff to due process before being denied release to CFC.[11] *See Smith v. Stoner*, 594 F. Supp. 1091, 1105-06 (N.D. Ind. 1984) (holding that state court sentence specifying the plaintiff's place of incarceration as the county jail and right to be on work release status created a liberty interest). However, "[a] procedural due process violation

[11] The Due Process Clause itself did not create a liberty interest in Plaintiff's entry into CFC. *See Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The initial decision to assign the convict to a particular institution is not subject to audit under the Due Process Clause, although the degree of confinement in one prison may be quite different from that in another."); *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (noting that federal prisoners have no "legitimate statutory or constitutional entitlement" to "classification and eligibility for rehabilitative programs"); *Fuller v. Shartle*, No. 4:11cv1821, 2012 WL 1068805, at *2-3 (N.D. Ohio Mar. 29, 2012) (holding that plaintiff's allegation that the defendants conspired to violate his constitutional rights by denying him the opportunity to participate in a residential drug treatment program failed to state a claim).

is only cognizable under § 1983 'when the state refuses to provide a process sufficient to remedy the procedural deprivation.'" *Collier v. Conway*, 672 F. App'x 950, 952 (11th Cir. 2016) (citing *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994)). Here, Plaintiff's Complaint suggests that he had a sufficient remedy through post-sentencing hearings wherein he could have challenged the assertion that a bed was unavailable at CFC or to address any other unlawful impediment to his release. *Haff I* at 7.

Plaintiff may also be attempting to assert a Fourteenth Amendment false imprisonment claim under the theory that he was entitled to be released to CFC on August 27, 2019, and that Harrell and Lamberth prevented it. "The Fourteenth Amendment Due Process Clause includes the 'right to be free from continued detention after it was or should have been known that the detainee was entitled to release.'" *Campbell v. Johnson*, 586 F.3d 835, 840 (11th Cir. 2009) (quoting *Cannon v. Macon Cnty.*, 1 F.3d 1558, 1562-63 n.3, modified on other grounds, (11th Cir. 1993))). "A § 1983 claim of false imprisonment requires a showing of common law false imprisonment and a due process violation under the Fourteenth Amendment. The elements of common law false imprisonment are an intent to confine, an act resulting in confinement, and the victim's awareness of confinement. *Id.* (citing *Cannon*, 1 F.3d at 1562-63 n.3). "To establish a due process violation, [a plaintiff] must prove that [the defendant] acted with deliberate indifference." *Campbell*, 586 F.3d at 840. Here, it is not clear that Plaintiff states a false imprisonment claim because the trial court's order did not direct that Plaintiff be released without conditions but only directed that he be released to CFC. *Haff I* (Doc. 1, at 6). Further, Plaintiff does not allege facts showing that Harrell acted with deliberate indifference as opposed to merely concluding—perhaps negligently—that CFC had no bed

for Plaintiff.[12] Finally, Plaintiff does not explain how Lamberth's registration of him as a sex offender—as opposed to him actually being a sex offender—prevented him from going to CFC.[13]

Regardless of the exact nature of Plaintiff's claims, however, they appear to be barred by the statute of limitations. "A prisoner's complaint may be dismissed . . . as time-barred if it 'appear[s] beyond a doubt from the complaint itself that [the prisoner] can prove no set of facts which would avoid a statute of limitations bar.'" *Zamudio v. Haskins*, 775 F. App'x 614, 615 (11th Cir. 2019) (quoting *Hughes v. Lott*, 350 F.3d 1157, 1163 (11th Cir. 2003)). "In section 1983 actions, federal courts refer typically to state law to determine the applicable statute of limitations and tolling rules." *Id.* at 615-16 (citing *Wallace v. Kato*, 549 U.S. 384, 394 (2007)). The Georgia statute of limitations for personal injury is two years. O.C.G.A. § 9-3-33; s*ee also Bell v. Metro. Atlanta Rapid Transit Auth.*, 521 F. App'x 862, 864 (11th Cir. 2013) ("The forum state's statute of limitations for personal injury actions applies to § 1983 claims, which in Georgia is two years."). A statute of limitations begins to run when a cause of action accrues—in other words, when "the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Rozar v. Mullis*, 85 F.3d 556, 561-62 (11th Cir. 1996) (internal quotation omitted) (citation omitted).

[12]Plaintiff alleges that Harrell falsified paperwork by stating he could not be released to CFC because he was a sex offender. *Id.* at 8. However, he also alleges that Beyers changed CFC's policy to not allow any more sex offenders. *Id.* at 7. Plaintiff does not explain how he could have entered CFC considering this change, so it is not clear to the Court that Harrell's notation on the paperwork is necessarily false. Further considering Beyers' policy change, it is not clear how—even had Harrell not prevented Plaintiff's release to CFC on August 27, 2019—Plaintiff could have remained at CFC and completed the program as required by the trial court as a condition of his suspended sentence.

[13]Plaintiff does not deny that he is required to register as a sex offender, and he even states that when he goes on vacation, he notifies sheriff's departments if he is going to be in their area for more than seventy-two hours. *Haff II* (Doc. 1 at 9).

Although Plaintiff states that he "was unaware" of what happened after the August 26, 2019, plea hearing and only received "further information" when he got back in touch with Beyers in January 2026, *Haff I* (Doc. 1 at 6-7), his factual allegations establish that he knew enough to assert a claim related to denial of release to CFC before the expiration of the statute of limitations. Plaintiff alleges that during the status conference "30 to 40 days" after August 27, 2019, his attorney told the state court judge that the reason Plaintiff was not at CFC was because no bed was available, which Plaintiff knew at the time was not true. *Id.* Further, Plaintiff's complaint shows that he knew at some point in 2022 or 2023 that Harrell was the one responsible for blocking his release to CFC as demonstrated by Plaintiff's letter to her supervisor, Norton. *Id.* at 8-9. Plaintiff further states that he tried to file a complaint with officials at Coastal State Prison. *Id.* at 9. Regarding Lamberth, Plaintiff knew that he was registering him a sex offender in 2019 and, even if Plaintiff did not know that this was a "registration violation"—as he contends it was—, his ignorance of the law does not bar the running of the statute of limitations. *See Rice v. Sixteen Unknown Fed. Agents*, 658 F. App'x 959, 962 (11th Cir. 2016) ("Neither Rice's ignorance of the law nor his *pro se* status constitute 'extraordinary circumstances' sufficient to toll the running of the statute of limitations."). Here, Plaintiff did not file his federal lawsuit until January 25, 2026.[14]

Alternatively, even if Plaintiff's claims were not barred by the applicable statute of limitations, they appear to be barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). Under

[14]Although the Court received Plaintiff's complaint in *Haff I* on February 23, 2026, Plaintiff signed it on January 25, 2026. *Haff I* (Doc. 1 at 23). "Under the prison mailbox rule, a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing." *United States v. Glover*, 686 F.3d 1203, 1205 (11th Cir. 2012) (internal quotation marks omitted). "Unless there is evidence to the contrary, like prison logs or other records, we assume that a prisoner's motion was delivered to prison authorities on the day he signed it." *Id.*

*Heck*, a "district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Heck*, 512 U.S. at 487. Here, for Harrell to be found liable, Plaintiff would have to show that he was entitled to be released to CFC. A finding that Plaintiff was entitled to be released to CFC—the completion of which would result in the suspension of the service portion of the sentence—would necessarily imply that his subsequent sentence to an unsuspended prison sentence was invalid. However, Plaintiff does not allege that he successfully challenged his conviction and sentence through habeas or otherwise.

C. Denial of Parole

Plaintiff alleges that Harrell blocked him from being released on parole by refusing to provide him with a "level letter," denying each of his proposed private residences, and by providing erroneous information to SORRB that led to him being labeled as an SDP. *Haff I* (Doc. 1 at 8-11).

Plaintiff's allegations that Harrell prevented his parole by refusing to provide a "level letter" or approving housing fail to state a claim for relief. "Georgia's parole system does not create a legitimate expectation of parole such that there is a liberty interest in parole that is subject to due process protections." *Moore v. Ga. Bd. of Pardons & Paroles*, No. 23-12468, 2024 WL 1765706, at *4 (11th Cir. Apr. 24, 2024) (citing *Jones v. Ray*, 279 F.3d 944, 946 (11th Cir. 2001)). There is also no federal constitutional right to parole. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). Thus, the fact that Harrell's actions—and Norton as her supervisor—may have interfered with Plaintiff's eligibility for parole does not implicate a constitutional right. *See Delgiudice v. Primus*,

679 F. App'x 944, 948 (11th Cir. 2017) (holding that because the plaintiff had no liberty interest in parole, his allegation that placement in punitive segregation affected his parole failed to state a claim).

Regarding Plaintiff's allegation that Harrell provided "erroneous information" to SORRB that resulted in his being denied parole, *Haff I* (Doc. 1 at 10), state officials may not "rely on knowingly false information" to deny parole. *Monroe v. Thigpen*, 932 F.2d 1437, 1442 (11th Cir. 1991). However, "a conclusory allegation regarding the use of such information" is insufficient to state a claim. *Jones*, 279 F.3d at 946; *see Walker v. Fla. Parole Comm'n*, 299 F. App'x 900, 902 (11th Cir. 2008) ("[P]risoners do not state a due process claim by simply asserting that erroneous information might have been used during their parole consideration." (citing *Slocum v. Ga. State Bd. of Pardons and Paroles*, 678 F.2d 940 (11th Cir.1982))). Further, a plaintiff must show that the parole board relied on the false information in denying parole. *Jones*, 279 F.3d at 946; *see Lawrence v. Terry*, No. 5:20-cv-01576-LSC-JHE, 2023 WL 6133443, at *8 (N.D. Ala. July 18, 2023) (granting summary judgment on the grounds that even if the defendants knowingly provided false information to the parole board, the plaintiff did not show that the parole board relied on that information in denying parole), *recommendation adopted by* 2023 WL 6131613 (N.D. Ala. Sept. 19, 2023). Here, Plaintiff fails to allege what false information Harrell provided to SORRB and he fails to allege facts showing how erroneous information given to SORRB resulted in the parole board denying him parole.

Finally, these claims may also be barred by the statute of limitations. Plaintiff states that Harrell contacted SORRB eleven months prior to his discharge date. *Haff I* (Doc. 1, at 10). Plaintiff was discharged on March 2, 2024, so eleven months prior would

have been in April 2023. *Id.* at 11. Again, Plaintiff did not file suit until January 25, 2026.[15]

D. Post-release Events and Probation Revocation

The exact nature of Plaintiff's claims relating to events following his March 2024 release are also unclear, but they appear to center around his inability to obtain housing and the revocation of his probation for moving without permission. To the extent Plaintiff suggests that Harrell was obligated to assist him in finding housing, he fails to state a claim. An inmate "does not have a constitutional right to be provided with housing or housing assistance upon his release from prison." *Stardust v. Roberts*, No. 25-cv-877-wmc, 2026 WL 102977, at *1 (W.D. Wis. Jan. 14, 2026) (collecting cases); *Davis v. Rosa*, No. 3:16-cv-02406-MMA-BLM, 2016 WL 8453922, at *2 (S.D. Cal. Dec. 5, 2016) (finding that because the plaintiff was no longer incarcerated, his parole agents were "under no constitutional obligation to provide him with housing").

As for the remainder of Plaintiff's post-release claims, they all relate to the revocation of his probation for allegedly failing to notify probation officers of his move. He alleges that Broadway committed perjury by testifying that Plaintiff: 1) never returned to his residence in Pine Mountain, 2) never returned to the truck stop in Vienna, and 3) was not in a traffic accident as he claimed. *Haff I* (Doc. 1 at 14). He also asserts Lamberth was present during this testimony and failed to notify the court that Broadway was committing perjury. *Haff II* (Doc. 1, at 12-13). Plaintiff also asserts that Broadway tampered with a witness by convincing Clapham to testify that he believed Plaintiff to be dangerous and should not be released from prison. *Haff I* (Doc. 1, at 14-15). He contends

[15] To the extent Plaintiff claims that Lamberth's registration of him as a sex offender affected his parole, *Haff II* (Doc. 1 at 10), Plaintiff fails to allege facts showing how his registration as a sex offender impacted his parole eligibility. Further, any such claim would also be barred by the statute of limitations.

that Norton "covered up" for Broadway by stating that he had told the truth. *Id.* at 15.

However, Plaintiff's claims relating to his probation revocation are all barred by *Heck*. A finding that Defendants lied or "covered up" for the lies would necessarily "imply the invalidity" of his probation revocation, and Plaintiff does not allege that the revocation or revocation sentence has been overturned. *Heck*, 512 U.S. at 487. Probation revocation proceedings—even challenges to the process of probation revocation—are subject to the *Heck* bar. *Cobb v. Florida*, 293 F. App'x 708, 709 (11th Cir. 2008) (affirming dismissal at preliminary screening based on *Heck* because "the necessary implication of a grant of relief would be that [the plaintiff's] probation revocation is invalid").

Furthermore, it is well-established that witnesses in many types of judicial proceedings are entitled to absolute immunity. *See, e.g.*, *Jones*, 174 F.3d at 1281 (noting that "[t]he Supreme Court has interpreted § 1983 to give absolute immunity to functions intimately associated with the judicial phase of the criminal process" (internal quotation marks omitted)). This immunity has been extended to probation and parole officers testifying in revocation hearings. *See Holt v. Glenn*, 361 F. App'x 75, 77 (11th Cir. 2010) (probation officer entitled to immunity for claims arising from testimony at probation revocation hearing); *Holmes v. Crosby*, 418 F.3d 1256, 1258 (11th Cir. 2005) (parole officer who testified at revocation hearing was entitled to immunity because he was acting in the scope of his duties during hearing). Therefore, Defendant Broadway is entitled to immunity from claims related to his testimony at Plaintiff's revocation hearing.[16]

[16]Plaintiff makes a cursory allegation that Norton "conspired . . . with Harrell and Broadway to cover up their wrong doing." *Haff I* (Doc. 1at 4). He makes a similar allegation against Lamberth, stating that he "did conspire with . . . Harrell . . . to not release me to go to my plea bargain Christian Family Center program on August 26 and 27 of 2019." *Haff II* (Doc. 1at 15). Plaintiff's allegations are too vague and conclusory to state a conspiracy claim. "[T]he linchpin for conspiracy is agreement, which presupposes communication[.]" *Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., Fla.*, 956 F.2d 1112, 1122 (11th Cir.

E. March 2025 Release and Subsequent Indictment

Plaintiff's sole claim regarding his March 2025 release from detention and subsequent indictment appears to be that Lamberth "provided false testimony to secure an indictment[,] stating I was obligated to re-register in Dooly County." *Haff II* (Doc. 1 at 14). Again, though, Lamberth is entitled to immunity from such claim.[17] *See Rehberg*, 566 U.S. at 369.

Further, because Plaintiff's arrest was apparently pursuant to a legal process, his claim would be one for malicious prosecution. *See Williams v. Aguirre*, 965 F.3d 1147, 1158 (11th Cir. 2020) (noting that a seizure following an indictment is one pursuant to legal process). To state a claim for malicious prosecution, a plaintiff must first show that "he suffered a seizure pursuant to legal process that violated the Fourth Amendment." *Laskar v. Hurd*, 972 F.3d 1278, 1284 (11th Cir. 2020). "This burden requires him to 'establish (1) that the legal process justifying his seizure was constitutionally infirm and (2) that his seizure would not otherwise be justified without legal process.'" *Id.* (quoting *Williams*, 965 F.3d at 1165). "Second, [a plaintiff] must satisfy 'the elements of the common law tort of malicious prosecution.'" *Id.* (quoting *Williams*, 965 F.3d at 1157). To do this, a plaintiff must allege facts showing "that that the officials instituted criminal process against him 'with malice and without probable cause' and that the broader prosecution against him terminated in his favor." *Id.* (quoting *Williams*, 965 F.3d at 1157).

---

1992). However, Plaintiff's Complaint does not offer any specifics as to when or how Defendants communicated and reached an agreement to violate Plaintiff's constitutional rights. Plaintiff's conclusory reference to a "conspiracy," without any allegations of such communication is simply not enough to state a claim. *See Iqbal*, 556 U.S. at 678 ("[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

[17]Nothing in this Order should be construed as offering any opinion whatsoever on any issues in the criminal case against Plaintiff, which is also pending before the Court. The Court is simply observing that Plaintiff has failed to state a claim for which relief may be granted pursuant to § 1983.

Here, Plaintiff does not allege that the criminal prosecution terminated in his favor. Therefore, he fails to state a claim for malicious prosecution.

F. Medical Care at Dooly County Jail

Finally, Plaintiff's allegations regarding his medical care while in the Dooly County jail raise possible claims of deliberate indifference to a serious medical need. To state an Eighth Amendment claim for deliberate indifference to a serious medical need, a plaintiff must allege facts sufficient to establish: "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009). Whether a plaintiff has a serious medical need is an objective inquiry. *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). "[A] serious medical need is considered one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (internal quotation marks and citation omitted). Further, "the medical need must be one that, if left unattended, poses a substantial risk of serious harm." *Id.* (citation omitted).

To satisfy the deliberate indifference element, a "plaintiff must demonstrate that the defendant acted with subjective recklessness as used in the criminal law." *Wade*, 106 F.4th at 1262 (internal quotation marks and citation omitted). "[T]o do so, [the plaintiff] must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff—with the caveat . . . that even if the defendant actually knew of a substantial risk to inmate health or safety, he cannot be found liable . . . if he responded reasonably to the risk." *Id.* (internal quotation marks and citation omitted).

The final element for both claims—causation—simply requires "that a defendant

have a causal connection to the constitutional harm." *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1327 (11th Cir. 2007). "[A]s with any tort claim, [a plaintiff] must show that the injury was caused by the defendant's wrongful conduct." *Id.* at 1326. "Causation, of course, can be shown by personal participation in the constitutional violation." *Id.* at 1327.

Plaintiff's allegations are insufficient to state a claim. He alleges that the Dooly County jail failed to provide treatment for his "Dementia-Alzheimer's," *Haff II* (Doc. 1 at 15), but he does not explain what medical treatment he needed that they failed to provide. He also states he is a fall risk, but he does not allege how anyone at the jail acted with deliberate indifference to that risk. *Id.* at 15-16. He contends that an emergency room doctor told him that he needed gallbladder surgery, but an "unknown doctor" at the jail simply told Nurse White to document that he had high bilirubin. *Id.* at 16. However, Plaintiff does not provide more information to show that this was not simply a difference of opinion among medical providers, which is insufficient to support a claim of deliberate indifference. *See Culver v. Sanders*, 608 F. Supp. 3d 1171, 1183 (N.D. Fla. 2022) ("[A] disagreement among providers does not establish deliberate indifference." (citing *Bismark v. Fisher*, 213 F. App'x 892, 897 (11th Cir. 2007))). Plaintiff also asserts that he has periodontal disease and that "they" just gave him Listerine, which he says failed to alleviate the pain. *Haff II* (Doc. 1 at 16-17). However, Plaintiff neither identifies who "they" are, nor does he provide more factual information about what "they" knew about his condition.

Another issue with Plaintiff's deliberate indifference claim is that he identifies the doctor who saw him at the jail as simply the "unknown doctor." *Id.* at 3. "As a general matter, fictitious party pleading is not permitted in federal court." *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010). There is a "limited exception to this rule

when the plaintiff's description of the defendant is so specific as to be 'at the very worst, surplusage.'" *See id.* (quoting *Dean v. Barber*, 951 F.2d 1210, 1215-16 (11th Cir. 1992)). Plaintiff's description of the unknown doctor is insufficient to meet this standard.

Finally, Plaintiff alleges that Lamberth decided all his medical issues "contrary to Hippa Laws" and "us[ed] it as a terroristic tactic" to make him "resolve the criminal charge." *Haff II* (Doc. 1 at 17). Again, Plaintiff provides no facts to support this conclusory allegation.

**PLAINTIFF MUST RECAST HIS COMPLAINT**

In summary, Plaintiff's allegations fail to state a claim. Nevertheless, the Court cannot say that Plaintiff may not be able to state a claim through a more carefully drafted complaint. Further, a recast complaint will promote judicial efficiency by having one operative pleading.

Accordingly, Plaintiff is now **ORDERED** to recast his Complaint on the Court's standard form within **FOURTEEN (14) DAYS** of the date of this Order. The recast complaint must contain a caption that clearly identifies, by name, each individual that Plaintiff has a claim against and wishes to include as a Defendant in the present lawsuit. Plaintiff is to name only the individuals associated with the claim or related claims that he is pursuing in this action. Plaintiff must provide enough facts to plausibly demonstrate that each defendant's actions or omissions resulted in the violation of his constitutional rights. Conclusory and vague allegations are insufficient. Further, Plaintiff should try to be as specific as possible as to relevant dates and provide any reasons why he believes the statute of limitations may be subject to tolling.

When drafting his statement of claims on the Court's form, it is recommended that Plaintiff list numbered responses to the following questions (to the extent possible)

along with the name of each defendant:

(1) *What* did this defendant do (or not do) to violate your rights? In other words: What was the extent of this defendant's role in the unconstitutional conduct other than being in a supervisory role? Was the defendant personally involved in the constitutional violation? If not, did his actions otherwise cause the unconstitutional action? How do you know?

(2) *When* and *where* did each action occur (to the extent memory allows)?

(3) *How* were you injured as a result of this defendant's actions or decisions? If you have been physically injured, explain the extent of your injuries and any medical care requested or provided.

(4) *How* and *when* did this defendant learn of your injuries or otherwise become aware of a substantial risk that you could suffer a serious injury?

(5) *What* did this defendant do (or not do) in response to this knowledge?

(6) *What* relief do you seek from this defendant?

Plaintiff should state his claims as simply as possible, referring only to the relevant allegations against the named defendants in this case; he should not attach supporting documents to his recast complaint, use legal terminology, or cite any specific statute or case law to state a claim, although the Court will presume that Plaintiff's claims are brought under 42 U.S.C. § 1983 unless otherwise specified. *See* Fed. R. Civ. P. 8. If, in his recast complaint, Plaintiff fails to link a named defendant to a claim, the claim will be dismissed. Likewise, if Plaintiff makes no allegations in the body of his recast complaint against a named defendant, that defendant will be dismissed.

Plaintiff is cautioned that the opportunity to file a recast complaint is not an invitation for him to include every imaginable claim that he may have against any state official. Plaintiff will not be permitted to join claims against multiple defendants in one action unless Plaintiff can establish a logical relationship between the claims in accordance with the Federal Rules of Civil Procedure. Plaintiff is also cautioned to fully

and truthfully respond to each question presented on the standard form including but not limited to those questions regarding previous federal lawsuits and whether he has pursued grievances and exhausted his administrative remedies, or he risks dismissal of this case.

**The recast complaint will supersede (take the place of) the Complaints filed in *Haff I* and *Haff II*. Plaintiff may include additional pages with the Court's standard form, but the recast complaint must be no longer than TEN (10) PAGES in its entirety.** This ten-page limitation includes (and is not in addition to) the pre-printed pages of the Court's standard form. **The Court will not consider any allegations in any other document—including any previous complaints—or any allegations not contained within those ten pages, to determine whether Plaintiff has stated an actionable claim.** Accordingly, any fact Plaintiff deems necessary to his lawsuit should be clearly stated in his recast complaint, even if Plaintiff has previously alleged it in another filing.

## CONCLUSION

As set forth above, Plaintiff's motion to consolidate (Doc. 13) is **GRANTED**, *Haff II* is **CONSOLIDATED** into *Haff I*, and *Haff II* is **ADMINISTRATIVELY CLOSED**. Plaintiff's renewed motion to proceed IFP (Doc. 12) is **GRANTED**. Plaintiff is now **ORDERED** to file a recast complaint consistent with this order if he wants to proceed with this case. Plaintiff shall have **FOURTEEN (14) DAYS** from the date of this order to file his recast complaint. Plaintiff's failure to fully and timely comply with this order may result in the dismissal of this case.

The clerk is **DIRECTED** to forward Plaintiff a blank 42 U.S.C. § 1983 form along with his service copy of this order (with the civil action number showing on both). There

shall be no service in this case pending further order of the Court.

**SO ORDERED**, this 1st day of September, 2026.

s/ **ALFREDA L. SHEPPARD**
UNITED STATES MAGISTRATE JUDGE